UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**MESHALLE JONES**,                              Case No. 1:11 CV 2641

          Plaintiff,                              Magistrate Judge James R. Knepp II

   v.                                       MEMORANDUM  OPINION  AND
                                         ORDER

**COMMISSIONER OF SOCIAL SECURITY**,

          Defendant.

### INTRODUCTION

Plaintiff Meshalle Jones seeks judicial review of Defendant Commissioner of Social Security's decision to deny Supplemental Security Income (SSI). The district court has jurisdiction under 42 U.S.C. § 1383(c)(3). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 14). For the reasons given below, the Court affirms the Commissioner's decision denying benefits.

### BACKGROUND

On January 12, 2009, Plaintiff filed an application for SSI stating she was disabled due to arthritis in her spine, lupus, vaginal spasms, and depression and alleging a disability onset date of January 1, 2005. (Tr. 104, 122). Her claim was denied initially (Tr. 66) and on reconsideration (Tr. 72). Plaintiff then requested a hearing before an administrative law judge (ALJ). (Tr. 75). Born November 18, 1956, Plaintiff was 54 years old when the hearing was held on May 10, 2011. (Tr. 23, 31, 104). Plaintiff (represented by counsel) and a vocational expert (VE) testified at the hearing, after which the ALJ found Plaintiff not disabled. (Tr. 17, 23).

Medical History Before Alleged Onset Date

On December 15, 1989, an MRI of Plaintiff's lumbosacral spine showed very mild central canal stenosis at the L3-L4 and L4-L5 levels but was otherwise a normal study. (Tr. 209). On December 17, 1993, an MRI of her lumbar spine showed bulging at discs L4 and L5, but vertebral bodies normal in position, alignment, and marrow signal, and normal signal intensity at the disc spaces. (Tr. 210).

Medical History After Alleged Onset Date

On October 2, 2007, Plaintiff returned to her previous physician Dr. Leonor Osorio after treating with a Dr. Kaufman for some time. (Tr. 260). Plaintiff said she did not like the way Dr. Kaufman handled her treatment "because she was fighting him to do things and . . . did not feel she received good medical care". (Tr. 260). Plaintiff told Dr. Osorio she had undergone an MRI of her hip and also reported arthritis and knee pain. (Tr. 260). Later in the appointment, Plaintiff revealed she was upset because Dr. Kaufman canceled her disability and informed her she could work a desk job. (Tr. 260). Plaintiff reported she would not be able to do this due to back, hip, and knee pain, and vaginal spasms. (Tr. 260). Plaintiff also said she was depressed due to deaths in her family but denied suicidal ideation and said she had many friends to lean on. (Tr. 260). Examination revealed bilateral crepitation in her knees and pain with compression, flexion, and extension of the hip. (Tr. 260). Her gait was antalgic but steady. (Tr. 260). Dr. Osorio diagnosed chronic pain secondary to hip, back, and knees, depression without suicidal ideation, and gastroesophageal reflux disease (GERD). (Tr. 260). Plaintiff was taking Paxil at the time, was not interested in trying anything else for her depression, and refused help with smoking cessation. (Tr. 260–61). Dr. Osorio discussed pain management with Plaintiff, detailing drug screens and conditions for which she would be dismissed

2

from treatment if she did not comply. (Tr. 261).

*Back Pain and Treatment*

Plaintiff continued treating with Dr. Osorio until at least March 2011, seeing her approximately once a month to request medication refills and follow up on back pain and other health issues. Though some of Plaintiff's examinations showed complaints of back pain, paraspinal muscle spasms, loss of lumbar lordosis, or range of motion difficulties (Tr. 239, 254, 258, 309, 316–17, 403, 410–11, 419, 423, 426–27, 438–39, 444–45, 451, 478, 493, 499, 505, 507, 509), her musculoskeletal examinations were generally normal, she often said medication controlled her pain, and she rated her pain as a zero out of ten multiple times (Tr. 249–51, 253, 257, 305, 308, 312–13, 324, 402, 407, 415–16, 422, 430–31, 447, 450, 453, 458–59, 461, 468, 470, 480, 485, 487–89, 496–97, 506). Plaintiff repeatedly received prescriptions for Oxycontin, but Dr. Osorio told Plaintiff to take the drug only when necessary, advising her to treat her back pain with ice for localized tenderness and warm moist heat several times daily. (Tr. 305, 313, 317, 321, 324, 403, 407, 411, 416, 420, 423, 445, 451, 459, 468, 478, 489, 497, 503, 507). At one point, Dr. Osorio advised Plaintiff to "get off strong pain medication", but Plaintiff did not wish to do so. (Tr. 427). Eventually, Dr. Osorio offered to send Plaintiff to a pain management clinic or prescribe Percocet but Plaintiff refused both options,[1] and ultimately Dr. Osorio told Plaintiff she could not give her more Oxycontin and would not prescribe Nucynta. (Tr. 441, 449). Dr. Osorio never ordered physical therapy, recommended epidural injections, or suggested surgery.

---

1. This occurred in February 2011 after Plaintiff had sent Dr. Osorio a handwritten note requesting 120 40 milligram Oxycontin pills because it was cheaper than 60 80 milligram pills. (Tr. 441). Dr. Osorio told Plaintiff she "clearly [could] not do that". (Tr. 441).

*Hip and Knee Pain*

Dr. Osorio also treated Plaintiff for hip pain and knee pain. After the initial visit, Plaintiff only mentioned hip pain to Dr. Osorio one more time – at the next visit. (Tr. 258). Though not performed by Dr. Osorio, a March 2009 x-ray of Plaintiff's hip was normal. (Tr. 288).

In June 2008, Plaintiff reported right knee pain, stating her knee had recently given out. (Tr. 252). Dr. Osorio noted a fall secondary to osteoarthritis of Plaintiff's knees, stating she would order a knee x-ray if Plaintiff did not improve. (Tr. 252). Plaintiff reported left knee pain in January 2009 and physical examination revealed painful left knee movement and loss of range of motion. (Tr. 320–21). An x-ray of Plaintiff's left knee performed in March 2009 showed spur formation off the distal femur and proximal tibia, with spurring of tibial spines and spurs of the patella, but there were no fractures or dislocations. (Tr. 289). In May 2009, an x-ray of her right knee showed a moderate suprapatellar effusion, but no acute fracture or dislocation and no destructive or erosive osseous lesion. (Tr. 389). Plaintiff went to the emergency room (ER) in May 2009 complaining of knee pain and swelling, and after the ER visit Dr. Osorio's physical examination revealed a right knee effusion and mild knee pain. (Tr. 305).

On May 13, 2009, orthopedic surgeon Dr. William R. Bohl evaluated Plaintiff for pain and swelling in her right knee. (Tr. 301). Plaintiff denied any recent injury. (Tr. 301). She stated several days earlier her knee swelled and the ER performed aspiration, obtaining clear yellow fluid. (Tr. 301). Plaintiff described the pain as mild and denied catching or giving way of the knee, and Dr. Bohl noted there was no history of inflammatory arthritis or swelling in other joints. (Tr. 301). Examination revealed right knee effusion, with tenderness under both patellar facets and slight tenderness over the posteromedial joint line. (Tr. 301). However, Plaintiff had full range of motion

4

with a negative McMurray sign and no ligamentous laxity, but three-fourths of an inch of right thigh atrophy. (Tr. 301). Dr. Bohl reviewed her x-ray and said her main symptoms were due to chrondromalacia patella, but indicated an underlying problem was causing the right-knee effusion. (Tr. 301). He stated Plaintiff had no symptoms suggesting the normal causes for the effusion and decided to treat her condition as chrondromalacia patella with a nonspecific synovitis. (Tr. 301). He started her on Naproxyn and physical therapy (Tr. 301), but the record contained no indication Plaintiff ever actually went to physical therapy.

In June 2009, Plaintiff told Dr. Osorio her knee pain had improved. (Tr. 430). The following month – though she reported no falls – her examination was positive for painful left knee movement. (Tr. 426). She reported her pain was controlled in October 2009 (Tr. 415) but had bilaterally painful knee movement in November 2009 (Tr. 411). Plaintiff continued to have a decreased knee range of motion in March 2010, and at a follow-up appointment in April 2010 she said her pain was controlled. (Tr. 496, 502). Plaintiff went to the ER and had fluid drained from her knee following a fall in May 2010 and Dr. Osorio's follow-up examination revealed diminished knee range of motion and painful knee movement. (Tr. 493). Dr. Osorio referred Plaintiff to an orthopedic surgeon (Tr. 493), but the record contained no further mention of Plaintiff's knee pain.

*Vaginal Spasms*

Plaintiff said her vaginal spasms were controlled in November 2007. (Tr. 258). Dr. Osorio did not mention them again until May 2009, at which point her notes merely indicated Plaintiff reported having more of them. (Tr. 304). Plaintiff reported the spasms worsened in April 2010, and the following month Dr. Osorio deferred Plaintiff's pelvic exam due to a vaginal spasm. (Tr. 493, 496). By June 2010, the spasms had improved (Tr. 488), and in August 2010 Dr. Osorio noted Botox

5

may help with Plaintiff's vaginal spasms (Tr. 478). Notes from two gynecological consults in September 2010 made no specific mention of vaginal spasms, also indicating Plaintiff was in no pain and had no difficulty performing activities of daily living. (*See* Tr. 471, 473). Also in September 2010, Plaintiff told Dr. Osorio she was not experiencing severe pelvic pain. (Tr. 467) Plaintiff did complain of vaginal spasms at a gynecological consult in October 2010, but in November 2010 she told Dr. Osorio her vaginal pain was controlled. (Tr. 451, 457). The medical records also showed Plaintiff had a number of normal pelvic exams. (Tr. 313, 481–82, 489).

*Discoid Lupus*

Plaintiff first mentioned dermatological problems to Dr. Osorio on January 15, 2008, when she stated a generic version of Oxycontin made her itch and caused hives and spots on her face, forearms, and chest. (Tr. 256). At that time, Plaintiff had some lesions on her nose and chin. (Tr. 256). Dermatologist Dr. Oscar Saffold's notes from March 27, 2008 stated Plaintiff had returned for follow-up care after a year of absence, with two hyperpigmented nummular lesions on her nose. (Tr. 215). He diagnosed probable discoid lupus and ordered a biopsy, which eventually showed changes that "were not absolutely characteristic but would be compatible with end-stage discoid lupus erythematosus". (Tr. 215, 218). Plaintiff was also diagnosed with atopic dermatitis and acne vulgaris and prescribed medications. (Tr. 216). Plaintiff complained to Dr. Osorio about her hyperpigmented areas on May 15, 2008, stating she wanted another dermatologist's opinion. (Tr. 253).

In July 2008, dermatologist Dr. Gisela Torres-Bonilla treated Plaintiff for spots on her face. (Tr. 227). Plaintiff told Dr. Torres-Bonilla about her discoid lupus diagnosis and reported creams had not improved her condition. (Tr. 227). She also said she liked to lay in the sun and did not use sun screen. (Tr. 228). Dr. Torres-Bonilla diagnosed discoid lupus and discussed treatment options

6

with Plaintiff, along with advising Plaintiff of the "need for good photoprotection". (Tr. 228).

In December 2008, Plaintiff's examination with Dr. Osorio was positive for dermatological problems on her knees and face, and Dr. Osorio referred her to dermatology. (Tr. 324). Her examination was positive for hyperpigmentation on her face in January 2009, and Dr. Osorio again referred Plaintiff to a dermatologist. (Tr. 321).

In March 2009, Dr. Saffold stated Plaintiff suffered from hyperpigmented scarring on her face, which he reported could cause a negative effect on her self-esteem. (Tr. 214). He noted the diagnoses of probable discoid lupus erythematosus, acne vulgaris, and atopic dermatitis and said Plaintiff needed to avoid all exposure to the sun, soaps, detergents, common irritants, wools, and synthetic fibers. (Tr. 212–14). Several months later, in June 2009, he prescribed a medication and several ointments and also gave Plaintiff sun screen samples. (Tr. 333).

In November 2009, Dr. Osorio's examination revealed mild erythema and excoriation on Plaintiff's knee skin. (Tr. 411). Dr. Osorio also noted hyperpigmentation and lesions in July 2010. (Tr. 484–85). Plaintiff saw a dermatologist regarding a facial rash in September 2010. (Tr. 464). The doctor diagnosed discoid lupus and prescribed medications, while informing Plaintiff smoking would limit one medication's effectiveness. (Tr. 464). The doctor also advised Plaintiff about using sun screen and avoiding sun exposure. (Tr. 464). When Plaintiff saw Dr. Osorio in October 2010, she reported her discoid lupus medication made her drowsy. (Tr. 458). Dr. Osorio advised Plaintiff not to take it with her pain mediation and told her to follow up with dermatology if the side effects did not improve. (Tr. 459).

*Depression*

After her initial visit to Dr. Osorio, Plaintiff only mentioned depression at two more

appointments with her – once in November 2007 and once in March 2011. (Tr. 258, 438). In November 2007, Plaintiff denied suicidal ideation and stated she did not want to go to counseling. (Tr. 258). In March 2011, Plaintiff explained she was going through a lot and was depressed, but had no suicidal ideation. (Tr. 438). At this point, Dr. Osorio indicated Paxil was not controlling Plaintiff's depression symptoms and gave her samples of Cymbalta. (Tr. 440).

Opinion Evidence

*Consulting Physicians – Physical Functioning*

On March 31, 2009, consulting physician Dr. Dariush Saghafi examined Plaintiff, who complained of lower back pain. (Tr. 284). She explained her pain began in 1989 when a 500 pound patient fell on her during the course of her work as a nurse's aid. (Tr. 284). She reported that since then she had experienced muscle spasms in her lower back and self-described "vaginal spasms . . . [that seemed to] go together [with her back spasms] in some kind of way." (Tr. 284). Plaintiff said her spasms occurred three to four times a week and lasted from 30 minutes to two and a half hours, and stated she had to lay down during them because they rendered her unable to move. (Tr. 284). Plaintiff reported she lived at home alone but her daughter visited occasionally, and Dr. Saghafi's notes indicated Plaintiff could perform her activities of daily living. (Tr. 284). He noted she left her work as a van driver due to back pain and also noted Plaintiff had declined surgery. (Tr. 284).

An x-ray of Plaintiff's right hip was normal. (Tr. 288). An x-ray of her left knee showed spur formation off the distal femur and proximal tibia, with spurring of tibial spines and spurs of the patella, but there were no fractures or dislocations. (Tr. 289) Plaintiff's upper and lower extremity muscle tone and bulk were normal for her age, with no signs of focal atrophy, fasciculations, or myotonia. (Tr. 285). She had full strength in her upper and lower extremities and her sensory

8

examination was normal. (Tr. 285–86). She exhibited tenderness over her cervical spine through her lumbar spine and she reported improvement in her back pain with flexion of her knees. (Tr. 286). Plaintiff's reflexes were normal, and though she had a right antalgic gait due to back and right knee pain, she had a "good stride without the presence of shuffling, festination, turning difficulties, or predisposition to falls." (Tr. 286).

Dr. Saghafi concluded Plaintiff had low back pain which was "as likely as not . . . caused by degenerative disk disease of the lumbar spine." (Tr. 286). Plaintiff had no clinically significant evidence of a radicular process, and she showed unexplained left grip strength weakness. (Tr. 286). Dr. Saghafi concluded Plaintiff could lift, push, and pull normally to perform her activities of daily living, but reported an inability to perform heavy exertional lifting. (Tr. 286). He further stated she could not bend, walk, or stand for prolonged periods. (Tr. 286).

Dr. Willa Caldwell assessed Plaintiff's physical RFC and found Plaintiff could lift twenty pounds occasionally and ten pounds frequently; could stand, sit, or walk for about six hours in an eight-hour workday; and was unlimited in pushing or pulling. (Tr. 341). Dr. Caldwell noted Plaintiff's largely normal physical examinations, but noted she had a right antalgic gait and some range of motion issues. (Tr. 341). Dr. Caldwell opined Plaintiff could occasionally climb ramps and stairs but never ladders, ropes, or scaffolds, further finding Plaintiff could occasionally balance, stoop, kneel, crouch, and crawl. (Tr. 342). She found no manipulative, visual, communicative, or environmental limitations and found Plaintiff's complaints about her symptoms only partially credible because the intensity she reported was inconsistent with the evidence. (Tr. 344–45).

Dr. Rebecca R. Neiger opined Plaintiff's RFC should be limited to four hours of standing and/or walking in a day, which she noted would be consistent with Dr. Saghafi's recommendation

9

of no prolonged walking. (Tr. 348). Dr. Neiger agreed Plaintiff was only partially credible, noting her reported pain and limitations on standing, kneeling, and walking were mostly credible but exaggerated and also stating Plaintiff's back pain was controlled and her symptom report seemed exaggerated. (Tr. 348).

Dr. Esperdado Villanueva evaluated Plaintiff's physical RFC and agreed she could lift twenty pounds occasionally and ten pounds frequently, but checked the box stating Plaintiff could stand and/or walk for only two hours in an eight hours day. (Tr. 352). He also stated she could sit for six hours and was unlimited in pushing and pulling. (Tr. 352). Later in his RFC assessment, Dr. Villanueva stated "standing/walking limited to 4 hrs out of an 8 hr day." (Tr. 353). Dr. Villanueva assessed the same postural limitations as Dr. Caldwell, and likewise found no manipulative, visual, or communicative limitations but found Plaintiff should avoid concentrated exposure to extreme heat. (Tr. 354–55).

*Consulting Physicians – Mental Functioning*

On August 31, 2009, Plaintiff attended a psychological consultation with state agency psychologist Dr. Richard N. Davis. (Tr. 361). No tests were administered at the consultation. (Tr. 361). Dr. Davis noted Plaintiff gave vague responses when asked for specific dates and had not been receptive to scheduling the consultation. (Tr. 361). Throughout the examination, Plaintiff was "seemingly very resistive in presenting information". (Tr. 362). Plaintiff told Dr. Davis she graduated from high school in regular classes, receiving slightly above average grades, and also had training as a truck driver. (Tr. 363). Plaintiff would not talk about the reasons for her depression, reporting she did not see a psychiatrist. (Tr. 365). When Plaintiff expressed concern about the appearance of her face due to lupus, but Dr. Davis assured her no one would probably even notice.

(Tr. 363).  A consistent theme was that Dr. Davis "had to pull information from [Plaintiff] and this was not sitting well with her", and Plaintiff gave "a large number of non-answers." (Tr. 363, 365–66). She also inconsistently reported whether she had been hospitalized in the past three years. (Tr. 364).

Examination revealed some limitations in Plaintiff's abilities to think logically and use common sense and judgment. (Tr. 365). Plaintiff described difficulty sleeping. (Tr. 365). She said she sometimes cooked and reported she did not do the dishes; the dishwasher did them. (Tr. 365). Plaintiff reported her daughter did her laundry. (Tr. 365). She said she occasionally did some household tasks, bathed twice a week, and lived in her pajamas. (Tr. 365). Plaintiff told Dr. Davis she did not read, liked to watch television all day and smoke, and sometimes planted flowers. (Tr. 365). She reported having friends and seeing her mother several times a week. (Tr. 365). She also said she got along with her ten siblings and attended church once a month. (Tr. 365). Dr. Davis noted Plaintiff had no difficulty sitting. (Tr. 366). He concluded she was somewhat limited in her abilities to think logically and use common sense and judgment, assigned a GAF of 51, diagnosed adjustment disorder with depressed mood and borderline intellectual functioning, and indicated stress about physical problems contributed to her depression. (Tr. 366–67).

Dr. Davis opined Plaintiff was moderately impaired in relating to others, maintaining attention, concentration, and pace, and withstanding the stress and pressure of day-to-day work activity. (Tr. 367). He found her ability to understand, remember, and follow instructions only mildly impaired. (Tr. 367).

Dr. Kristen Haskins assessed Plaintiff's mental RFC and found Plaintiff moderately limited in the following areas:

her abilities to understand, remember, and carry out detailed instructions; maintain concentration for extended periods; sustain an ordinary work routine without special supervision; work in coordination with or proximity to others without being distracted by them; complete a normal workday and work week without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others.

(Tr. 369–70). Dr. Haskins noted Plaintiff's story was inconsistent and summarized Dr. Davis's report. (Tr. 371). She stated Plaintiff had moderate difficulties with activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. (Tr. 383). Ultimately, Dr. Haskins opined Plaintiff could perform simple work-related tasks in an environment that required no more than superficial interaction with others. (Tr. 371).

*Treating Physician Dr. Osorio – Physical and Mental Assessments*

On May 2, 2011, Dr. Osorio completed a clinical assessment of Plaintiff's pain, stating Plaintiff's pain would be distracting to adequate performance of daily activities or work; physical activity would greatly increase her pain to the point of causing her to become distracted from tasks or totally abandoning them; and side effects from Plaintiff's medication totally restricted her from being able to function at work. (Tr. 514). Dr. Osorio also opined Plaintiff could never lift more than five pounds; could only sit, stand, or walk for two hours in an eight hour day; could occasionally manipulate objects; and could only rarely push or pull, climb stairs or ladders, balance, bend, stoop, reach, be exposed to environmental problems, operate motor vehicles, or work with or around hazardous machinery. (Tr. 515). She further stated Plaintiff would likely miss four days of work per month. (Tr. 515).

Regarding Plaintiff's mental abilities, Dr. Osorio stated she had mild difficulty asking simple

12

questions or requesting assistance and moderate difficulty interacting appropriately with the general public and getting along with co-workers or peers. (Tr. 516). She also said Plaintiff had moderately deteriorating personal habits and moderately constricted interests, along with moderate restriction of activities of daily living. (Tr. 516). Dr. Osorio further found Plaintiff moderately limited in the following areas:

> understanding, remembering, and carrying out simple or complex instructions or repetitive tasks; maintaining concentration and attention for extended periods; performing activities within a regular schedule and maintaining regular, punctual attendance within customary tolerances; making simple work-related decisions; completing a normal workday and workweek without interruptions from psychological symptoms; performing at a consistent pace without an unreasonable number and length of breaks; responding appropriately to supervision; responding appropriately to changes in the work setting; responding to customary work pressures; and being aware of normal hazards and taking normal precautions.

(Tr. 516–18).

<u>Reports to the Agency</u>

Plaintiff reported she completed high school as well as job training as a truck driver and STNA. (Tr. 128). Her past work involved jobs as a general laborer at a factory, a home health aide, and a van driver. (Tr. 123). She described her past work at the factory, explaining she never lifted more than ten pounds, could sit or stand at will, and never stood or walked more than two hours per day. (Tr. 123, 164). Plaintiff also said that job ended when the factory closed. (Tr. 164).

Plaintiff reported she suffered from arthritis in her spine, lupus, vaginal spasms, and depression, reporting she could not sit for long periods of time. (Tr. 122). She also stated she missed a lot of work at her last job due to pain and stopped working because of her vaginal spasms. (Tr. 122). Plaintiff reported taking numerous medications to treat her conditions, including Flexeril, Oxycontin, and Paxil. (Tr. 127). She said some of her medications caused drowsiness. (Tr. 127). In

13

a later report, Plaintiff said Oxycontin affected her mental state but was effective to control her pain. (Tr. 172).

Plaintiff stated her knees went out from under her, she had lower back pain and numbness, she experienced body pain, and had depression. (Tr. 145). She also noted numbness in her legs, very painful vaginal locking, itching spots on her face, and difficulty bending. (Tr. 145). According to Plaintiff, stairs, turning certain ways, sitting, and standing worsened her pain. (Tr. 145). Plaintiff stated lupus caused butterfly rashes on her face resulting in semi-permanent skin discoloration, and she complained of itching and open sores on her face, stating sunlight worsened her rashes. (Tr. 196). She also reported frequent migraines, stated her vaginal spasms rendered her unable to move for up to several hours multiple times per week, and also said her depression had worsened. (Tr. 196–97).

Plaintiff reported she lived in a house alone and spent most of her time resting, taking her medication, and watching television, but sometimes went out with her daughter or a friend. (Tr. 153–54, 182). Plaintiff reported a number of hobbies including reading, watching television, and talking on the phone, and she said she did these things every day. (Tr. 157). Plaintiff said she could no longer go on long walks, skate, bowl, go to parks, or run. (Tr. 154, 157, 182). She said she cared for pets with her daughter helping her on bad days. (Tr. 154). She said she had difficulty sleeping. (Tr. 154). Plaintiff said she could accomplish personal care needs, but qualified this as depending on her pain level. (Tr. 155). She also stated she could make simple meals, but reported her daughter sometimes brought her food and she was sometimes too depressed to do anything. (Tr. 155, 183).

Plaintiff reported she could do household chores and yard work such as laundry, tidying, and planting flowers, but took a lot of breaks. (Tr. 156, 184). Plaintiff said she went outside as much as

14

possible and could drive or ride in a car. (Tr. 156). She also said she could grocery shop, but stated she rode in a cart at the store. (Tr. 156). She reported no problems managing money. (Tr. 157, 185). Plaintiff said she talked on the phone with friends but no longer wanted to spend time with them in person, and she said she went to doctor appointments and church once a month. (Tr. 157). She reported her conditions affected her ability to lift, stand for long periods, walk long distances, sit for long periods (sometimes), climb stairs (sometimes), kneel, squat, get along with others (depending on who it was), bend, remember, and concentrate, but she reported these difficulties inconsistently on her two function reports. (Tr. 158, 186).

Plaintiff described her medication as strong but effective. (Tr. 186). She explained she could walk from her house to the corner about eight houses down the street. (Tr. 158, 186). She also said she generally finished tasks and followed written and spoken instructions well. (Tr. 158). Plaintiff even initially said she handled stress and changes in routine well, though she later said she had problems handling stress. (Tr. 159, 187). She did not indicate using an ambulatory aid. (Tr. 159, 187). Plaintiff told the agency she thought Paxil controlled her mood and did not think her memory problems, depression, or irritability interfered with her functioning. (Tr. 162).

ALJ Hearing

At the hearing on May 10, 2011, Plaintiff testified her medication made her depressed, made it difficult for her to focus, and affected her voice, but she said she had not reported this to a doctor. (Tr. 32).[2] She testified she stopped working due to back pain and vaginal spasms, but said no physician had ever explained her vaginal spasms. (Tr. 33). Plaintiff's attorney stated the medical records documenting the spasms were "just . . . subjective report[s]". (Tr. 33). Plaintiff said her

---

2. Later, Plaintiff said she *had* told her doctor about her medication side effects. (Tr. 40).

doctor told her it could be due to her back injury even though both the ALJ and Plaintiff's attorney agreed there were only subjective reports. (Tr. 33). Plaintiff also told the ALJ Dr. Osorio had witnessed one of these spasms. (Tr. 35).

Plaintiff first testified she did not drive, then clarified she simply was not driving at the time but had driven a week and a half earlier. (Tr. 36–37). She said her back hurt unless she was laying down. (Tr. 37). Plaintiff testified she had used ice or heat as instructed by Dr. Osorio, but it did not help. (Tr. 38–39). Despite a complete lack of corroborating treatment records, Plaintiff said Dr. Osorio sent her to physical therapy, but it did not work because she could not bend or lift her legs up. (Tr. 39–40). Plaintiff gave vague answers about how much she could walk, said she could only stand for about five to ten minutes, and said she had to keep repositioning herself. (Tr. 43–44). She testified about radiating back pain, knee pain, her legs going out from under her, diminished left-hand grip, and lupus-caused itching, swelling, and spots made worse by sun exposure. (Tr. 44–46).

Plaintiff told the ALJ she had not used a cane the day of the hearing, but said her doctor ordered a cane for her – again, despite the lack of any medical record showing this to be true. (Tr. 46–47). She said she spent her days reading and watching television and only sometimes had problems following stories. (Tr. 47–48). She said she lived alone but her granddaughter frequently came over to cook and clean for her. (Tr. 48–49). Plaintiff acknowledged Dr. Osorio warned her about the possibility of becoming addicted to Oxycontin but stated she did not feel she had a problem with the drug. (Tr. 50). Plaintiff testified she previously received SSI benefits, which stopped in 2006 or 2007, and said her condition had deteriorated since then. (Tr. 50–51).[3] She also

---

3. The ALJ's decision explained Plaintiff received benefits until mid-2007. (Tr. 9). However, Plaintiff had returned to work in 2005 and her earnings resulted in overpayment. (Tr. 9).

16

stated her depression was getting worse, but she was not seeing a counselor or therapist. (Tr. 51).

The VE testified Plaintiff had past relevant work as a companion, van driver, home health aide, and production assembler. (Tr. 53–54). The ALJ asked the VE to consider a person of Plaintiff's age, education, and work history who could perform a range of light jobs with a number of other restrictions ultimately incorporated into the RFC. (Tr. 13, 58–59). The VE testified such a person could perform Plaintiff's past work as a production assembler. (Tr. 59). The VE then testified someone could still perform the production assembler job if she were limited to standing two hours in an eight-hour workday. (Tr. 59). If she were limited to occasional use of her non-dominant hand, the VE testified the person would not be able to do past work but could work in multiple machine tending positions, each accounting for significant jobs in the national economy. (Tr. 59–60). Finally, the VE testified the person likely would not be able to maintain employment if she needed to leave the work site for an hour unscheduled every month. (Tr. 62).

ALJ Decision

The ALJ found Plaintiff had not engaged in substantial gainful activity since her application date of December 31, 2008. (Tr. 9). The ALJ found Plaintiff suffered from the severe impairments of deconditioning and limited intellectual functioning but found these impairments did not meet or medically equal a listing. (Tr. 9,12). In determining Plaintiff's severe impairments, the ALJ discussed Plaintiff's numerous conditions at length, explaining in detail her reasons for finding many of them not severe or not medically determinable. (Tr. 9–12).

The ALJ considered Plaintiff's depression but found it non-severe because Plaintiff did not mention specific depressive symptoms during testimony, numerous medical records noted her depression was controlled with medication and did not interfere with her functioning, there was no

17

history of psychiatric consultation, hospitalization, or mental health counseling, and the record showed no more than mild limitations in daily activities. (Tr. 10). She found Plaintiff's discoid lupus non-severe because while it required Plaintiff to remain out of the sun, the limitation was not work-related. (Tr. 11).

The ALJ found Plaintiff's lower back pain not medically determinable but considered her complaints of pain in drafting the RFC. (Tr. 11). Specifically, the ALJ noted the record contained no MRIs or x-rays of Plaintiff's lumbar spine during the relevant period, Dr. Osorio had recommended conservative treatment, Plaintiff's symptoms and pain were generally well-controlled on Oxycontin, objective findings had generally been unremarkable, and Plaintiff's daily activities were inconsistent with her complaints. (Tr. 11).

The ALJ also found Plaintiff's borderline intellectual functioning (based on a psychological consultative examination that was based largely on Plaintiff's self-reported symptoms) not medically determinable because the record did not indicate any of Plaintiff's physicians had concerns about her cognitive functions. (Tr. 11). Also, the consultative examination had not included psychometric testing to determine Plaintiff's cognitive abilities. (Tr. 11). Further, the ALJ noted Plaintiff had graduated from high school, obtained a commercial driver's license, attended training courses, and worked at substantial gainful activity levels in the past. (Tr. 11). Thus, the ALJ found any cognitive issues were "better described under the severe impairment of limited intellectual functioning." (Tr. 11).

Considering Plaintiff's knee pain, the ALJ found it not related to a medically determinable condition because no x-rays or MRIs reflected degenerative changes, arthritis, or internal derangement and there was no record of any medical diagnosis related to the alleged right knee pain.

(Tr. 11). Moreover, Plaintiff's physical examinations generally revealed a full range of motion. (Tr. 11). The ALJ also found Plaintiff's self-reported vaginal spasms not medically determinable because treatment notes reflected little mention of the condition, did not explain its severity, did not show specialty consultation or further testing to determine the cause of the condition, and showed no evidence of a longitudinal treatment history for the condition. (Tr. 11–12).

The ALJ determined Plaintiff had the RFC to perform light work, with the following additional limitations:

> She is able to lift or carry twenty pounds occasionally and ten pounds frequently. She can stand or walk for four hours during an eight-hour day and sit for six hours during an eight-hour day. She is able to occasionally climb stairs or ramps, balance, kneel, crouch, crawl, and stoop. She is not able to climb ladders or scaffolds. [She] is able to perform routine, repetitive tasks with easily explainable changes in a relatively stable work environment.

(Tr. 13). Explaining, the ALJ noted Plaintiff was not obese but was completely inactive and her body habitus would reasonably interfere with her physical functioning, particularly when combined with subjective pain complaints and lack of physical activity. (Tr. 14).

The ALJ stated Plaintiff had not shown a restriction on her ability to perform activities of daily living consistent with her alleged symptom severity, noting her medical care "ha[d] been almost entirely based on subjective complaints rather than objective medical findings" and emphasizing Plaintiff's only treatment "consisted of strong narcotic medication therapy", with no physical therapy, epidural injections, or surgery, and with Plaintiff expressing no interest in these options. (Tr. 14). Further, the ALJ noted that though Plaintiff alleged no problems with narcotic pain medication, "the extent of her use, despite minimal evidence of serious medical conditions, is suggestive of possible addiction or overuse." (Tr. 14–15). The ALJ also drew attention to numerous inconsistencies between Plaintiff's testimony and the medical evidence.

19

The ALJ gave great weight to the opinions of the state agency medical consultants, finding their opinions consistent with treatment documentation, objective evidence, and Plaintiff's daily activities. (Tr. 15). The ALJ gave some weight to consultative examiner Dr. Saghafi's opinions because his conclusion that Plaintiff could not bend, walk, or stand for extended periods was vague but partially supported. (Tr. 15). She gave little weight to Dr. Osorio's opinion that Plaintiff is limited to less than sedentary work because it was inconsistent with objective medical findings and Dr. Osorio's own treatment documentation, and there was no evidence Plaintiff had ever used or been prescribed an assistive device or complained to her doctor about medication side effects. (Tr. 15). The ALJ gave weight to psychological consultant Dr. Davis's opinion regarding Plaintiff's limitations thinking logically and withstanding stress, but gave little weight to his conclusion that Plaintiff would be moderately limited in relating to others because this was inconsistent with Plaintiff's reported social functioning. (Tr. 16). The ALJ also gave little weight to the state agency consultant's and Dr. Osorio's conclusions regarding mental limitations, finding them inconsistent with the record. (Tr. 16).

Taking Plaintiff's RFC into account and considering VE testimony that Plaintiff could perform her past relevant work as a production assembler, the ALJ determined Plaintiff was not disabled. (Tr. 16–17). The Appeals Council denied review (Tr. 1), making the ALJ's decision the final decision of the Commissioner.

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the

record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for DIB is predicated on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. § 404.1520 – to determine if a claimant is disabled:

1. Was the claimant engaged in a substantial gainful activity?

2. Did the claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can she perform past relevant work?

5. Can the claimant do any other work considering her residual functional capacity,

age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in steps one through four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at step five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* A claimant is only determined to be disabled if she satisfies each element of the analysis, including inability to do other work, and meets the duration requirements. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff argues the ALJ erred by failing to find Plaintiff has severe physical impairments exceeding deconditioning. (Doc. 12, at 10–11). She also argues the ALJ improperly evaluated the opinions of Dr. Osorio and Dr. Saghafi. (Doc. 12, at 12–16). Finally, Plaintiff argues the ALJ improperly relied on the VE's testimony. (Doc. 12, at 16–17).

Severe Impairments

Plaintiff's first argument stems from the ALJ's obligation at step two of the disability analysis to determine whether a claimant suffers a "severe" impairment – one which substantially limits an individual's ability to perform basic work activities. 20 C.F.R. § 404.1520(a)(4)(ii); *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 576-77 (6th Cir. 2009). But the regulations do not require the ALJ to designate each impairment as "severe" or "non-severe"; rather, the determination at step two is merely a threshold inquiry. 20 C.F.R. § 404.1520(a)(4)(ii). "After an ALJ makes a finding of severity as to even one impairment, the ALJ 'must consider limitations and restrictions imposed

22

by *all* of an individual's impairments, even those that are not 'severe.'" *Nejat*, 359 F. App'x at 576 (quoting SSR 96-8p, 1996 WL 374184,  at *5) (emphasis in original). In other words, if a claimant has at least one severe impairment, the ALJ must continue the disability evaluation and consider all the limitations caused by the claimant's impairments, severe or not. And when an ALJ considers all a claimant's impairments in the remaining steps of the disability determination, the failure to find additional severe impairments does not constitute reversible error. *Nejat*, 359 F. App'x at 577 (citing *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)).

Plaintiff argues objective medical evidence shows her back and knee abnormalities, vaginal spasms, and depression caused more than minimal restrictions on her ability to work and thus should have been found severe. (Doc. 12, at 10–11). However, the ALJ found she suffered from severe impairments and explicitly stated she considered the effects of Plaintiff's reported pain in the RFC determination. (Tr.9–12). Additionally, the ALJ explained in great detail why she found a number of Plaintiff's reported conditions either non-severe or not medically determinable, and substantial evidence supports her conclusions. (Tr. 10–12).

The ALJ found Plaintiff's depression non-severe because though she was diagnosed with the disorder and treated with medications, the record contained no indication of psychiatric consultation, hospitalization, or mental health counseling. (Tr. 10). This is true, and Plaintiff also stated she thought medication controlled her symptoms, repeatedly refused counseling, and told the Social Security Administration (SSA) her depression did not interfere with her functioning. (Tr. 162, 258, 260–61, 338, 365). Plaintiff also did not mention specific depression-related symptoms during the hearing. Though Plaintiff claimed her depression affected her life, the evidence showed – as the ALJ correctly noted – Plaintiff lived independently and accomplished activities of daily living including

23

attending to personal hygiene, preparing meals, performing household chores, planting flowers, managing her finances, driving, shopping, having numerous friends, socializing regularly with family, and attending medical appointments and church. (Tr. 153–59, 284, 286, 472–73, 483). Plaintiff also stated she could follow instructions, pay attention, handle stress, and adapt to change. (Tr. 158–59, 187). During the course of years of monthly appointments with Dr. Osorio, Plaintiff mentioned her depression only a handful of times, and at these appointments Plaintiff said she had friends to lean on, denied suicidal ideation, and was not interested in counseling. (Tr. 258, 260–61, 438). Further, at the consultative examination with Dr. Davis, Plaintiff resisted providing information and gave a large number of non-answers. (Tr. 361–66). Thus, substantial evidence supports the ALJ's conclusion that depression was not a severe impairment.

Substantial evidence also supports the ALJ's conclusion that borderline intellectual functioning was not medically determinable based on Plaintiff's medical record. She accurately stated Plaintiff's physicians noted no concerns about her cognitive functioning, Plaintiff graduated from high school achieving average grades in regular education classes, and Plaintiff obtained additional vocational training. (Tr. 363). The ALJ also accurately noted Dr. Davis's assessment was not based on any objective intelligence or psychometric testing, something Plaintiff's attorney acknowledged when stating borderline intellectual functioning was not the basis of Plaintiff's claim and they would not "hang [their] hat" on it being medically determinable, agreeing it was "on the fence." (Tr. 30). Ultimately, the ALJ properly accounted for any cognitive or other mental impairments Plaintiff might have had by limiting her RFC to routine, repetitive tasks with easily explainable changes in a relatively stable work environment. (Tr. 13).

The ALJ found Plaintiff's lower back pain not medically determinable, but nevertheless

considered her pain complaints in drafting the RFC. (Tr. 11). Because the ALJ considered it at later stages of the disability evaluation, the failure to find back pain was a severe impairments did not constitute reversible error. *See Nejat*, 359 F. App'x at 577 (citing *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)). Moreover, substantial evidence supports the ALJ's conclusion that Plaintiff's back pain was not associated with a medically determinable impairment. The only x-rays documenting lumbar spine problems were from long before Plaintiff alleged her disability began (Tr. 209–10), and none of Plaintiff's doctors obtained lumbar spine x-rays during the relevant period.[4] Despite prescribing extremely strong pain medication based on Plaintiff's subjective complaints, Dr. Osorio recommended conservative treatment consisting only of ice and warm moist heat. She never recommended physical therapy, injections, or surgery – something the ALJ correctly noted. (*See* Tr. 11). The ALJ also correctly noted, and the Court described in detail above, that Plaintiff's physical examinations were largely normal, "with only occasional findings of tenderness and limited motion." (Tr. 11). Overall, the evidence supports the ALJ's conclusion regarding Plaintiff's back pain, but the ALJ also avoided any error by considering Plaintiff's pain at subsequent steps of the disability evaluation.

The ALJ found Plaintiff's knee pain not medically determinable because objective findings were generally unremarkable. (Tr. 11). Though 2009 x-rays did show a moderate effusion and some knee abnormalities (Tr. 289, 389), Plaintiff had a full range of motion in May 2009 and her pain had improved the following month (Tr. 301, 430). Plaintiff also had full strength, normal muscle bulk and tone in her lower extremities, and normal reflexes. (Tr. 286). Though Dr. Osorio referred

---

4. Moreover, the 1989 MRI showed only "very mild" central canal stenosis, and the 1993 MRI revealed a number of normal findings including vertebral bodies in normal position and alignment. (Tr. 209–10).

Plaintiff to an orthopedic surgeon in May 2010, the record contains no further mention of knee pain. (Tr. 493). And Plaintiff's gait was always steady, with few issues despite being slightly antalgic. (Tr. 254, 260, 286).

The ALJ explained she found Plaintiff's discoid lupus non-severe because while it required Plaintiff to remain out of the sun, that limitation was not work-related. (Tr. 11). Though Plaintiff contends this should have been found severe, there is only one indication the condition might at all affect Plaintiff's ability to work – Dr. Saffold's note explaining she needed to avoid soaps, detergents, and common irritants. (Tr. 213). However, this instruction never appeared in her dermatological medical records. (*See* Tr. 215–17, 227–28). Though Plaintiff was instructed to stay out of the sun and exercise good photoprotection, the record showed she enjoyed spending time in the sun without sun screen, and doctors repeatedly gave her sun screen samples and encouraged her to protect herself from sun exposure. (Tr. 228, 333, 464). This suggests medical noncompliance incompatible with a severe medical impairment, and the ALJ reasonably concluded discoid lupus was not a severe condition limiting Plaintiff's ability to work.

Plaintiff argues the ALJ should have found her reported vaginal spasms to be a severe impairment, arguing physician notes showed the spasms "were so significant that botox injections were recommended and a pap test had to be deferred". (Doc. 12, at 11). However, the medical record only contained Plaintiff's subjective complaints of vaginal spasms and she noted the spasms were controlled or improving on several occasions. (*See* Tr. 258, 260, 284, 304, 450–51, 457, 478, 488, 493, 496). Nothing in the record suggests a medical cause for the spasms, despite Plaintiff's testimony that a doctor told her it could be caused by a back injury. (Tr. 34).

Though Dr. Osorio did recommend Botox injections (*see* Tr. 478), there is no evidence

26

Plaintiff ever tried the injections – a choice at odds with her complaints that these spasms occurred multiple times a week and prevented her from doing anything for up to two hours. And as to Plaintiff's citation to the record entry by Dr. Osorio that a pelvic exam was postponed due to a spasm, there is no indication this was anything other than a subjective report. Plaintiff's pelvic exam the following month was normal, and Dr. Osorio did not describe the severity of the spasm or refer Plaintiff to a gynecologist to treat the spasms. (Tr. 489, 493). The ALJ was more than justified in finding Plaintiff's vaginal spasms were not reasonably related to a medically determinable impairment because, as she stated, pelvic exams were routinely normal, there was no evidence of longitudinal treatment history for the condition, and there was no specialty consultation to determine the condition's cause. (Tr. 12).

The ALJ found Plaintiff suffered from severe impairments, thoroughly and logically explained her reasons for finding numerous conditions non-severe or not medically determinable, and considered Plaintiff's subjective complaints of pain at subsequent steps of the disability evaluation. She therefore did not err at step two.

Treating Physician Rule

Generally, medical opinions of treating physicians are accorded greater deference than non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairments and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242. A treating physician's opinion is given "controlling weight"

if it is supported by: 1) medically acceptable clinical and laboratory diagnostic techniques; and 2) is not inconsistent with other substantial evidence in the case record. *Id.* (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). When a treating physician's opinion does not meet these criteria, an ALJ must weigh medical opinions in the record based on certain factors. 20 C.F.R. § 404.1527(c)(2).[5] In determining how much weight to afford a particular opinion, an ALJ must consider: (1) examining relationship; (2) treatment relationship – length, frequency, nature and extent; (3) supportability – the extent to which a physician supports his findings with medical signs and laboratory findings; (4) consistency of the opinion with the record as a whole; and (5) specialization. *Id.*; *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010).

Importantly, the ALJ must give "good reasons" for the weight he gives a treating physician's opinion, reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id*. An ALJ's reasoning may be brief, *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009), but failure to provide any reasoning requires remand. *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409–10 (6th Cir. 2009). Good reasons are required even when the ALJ's conclusion may be justified based on the record as a whole. The reason-giving requirement exists, in part, to let claimants understand the disposition of their cases, particularly in cases where a claimant knows his physician has deemed him disabled and might be bewildered when told by an ALJ he is not, unless some reason for the agency's decision is supplied. *Wilson*, 378 F.3d at 544 (quotations omitted). "The

_____

5. 20 C.F.R. § 404.1527(d) – the regulation section defining the treating physician rule – was recently renumbered to § 404.1527(c) due to revisions not affecting the provision or rule. 77 FR 10650, at *10656 (Feb. 23, 2012). Many cases cite § 404.1527(d) to explain the rule but the undersigned will cite the current and correct citation throughout this order.

requirement also ensures the ALJ applied the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Id.*

*Dr. Osorio*

Plaintiff argues the ALJ erred by giving little weight to Dr. Osorio's opinion, stating the opinion is supported by objective evidence and consistent with her treatment notes. (Doc. 12, at 13–14). This is simply not true. Though Dr. Osorio's opinion stated Plaintiff had difficulty walking, treatment notes do not show she ever prescribed a cane for Plaintiff and there is no indication Plaintiff ever used one; indeed, Plaintiff denied using one numerous times. (Tr. 46, 159, 187). Moreover, though treatment notes showed Plaintiff's gait was antalgic, it was steady, and Dr. Saghafi's consultative examination revealed Plaintiff had a good stride and very few difficulties walking. (Tr. 254, 260, 286). Numerous records also noted Plaintiff could perform her activities of daily living. (Tr. 284, 286, 472–73, 483).

In her RFC summary, Dr. Osorio stated Plaintiff's pain would distract her and prevent her from performing work activities; however, her own treatment notes and other medical records show Plaintiff's physical examinations were generally normal and her pain was controlled with medication. (Tr. 249–51, 253, 257, 305, 308, 312–13, 324, 402, 407, 415–16, 422, 430–31, 447, 450, 453, 458–59, 461, 468, 470, 480, 485, 487–89, 496–97, 506). Plaintiff's knee range of motion, lower extremity muscle tone, strength, and reflexes were normal on several occasions, and her gait had only slight abnormalities. And despite Plaintiff purportedly suffering disabling pain, Dr. Osorio never recommended a more aggressive treatment approach for her back pain than ice and warm moist heat, in combination with Oxycontin. (Tr. 305, 313, 317, 321, 324, 403, 407, 411, 416, 420, 423, 445, 451, 459, 468, 478, 489, 497, 503, 507). Nothing in the record even suggested Plaintiff

29

asked about more aggressive treatment options. The evidence showed she was content with brand name Oxycontin, believed it controlled her pain, and refused to go to pain management despite being advised to do so. (Tr. 256, 316, 439, 441).

Dr. Osorio said Plaintiff's medications caused side effects so severe they would prevent her from working, but her own records refute this. Plaintiff only discussed side effects a few times with Dr. Osorio – several times to complain generic Oxycontin caused unpleasant side effects, and once to complain that her discoid lupus medication caused drowsiness. (Tr. 256, 316, 458–59). In response to Plaintiff's complaints, Dr. Osorio told her not to take the discoid lupus medication with her Oxycontin and advised her to follow up with dermatology if the problem continued. (Tr. 459). There is no indication Plaintiff ever followed up with dermatology about the side effects.

The ALJ gave Dr. Osorio's opinion little weight because Dr. Osorio concluded Plaintiff was limited to less than sedentary work but that opinion was not supported by objective medical findings or Dr. Osorio's own treatment records. (Tr. 15). Based on the medical evidence set forth in detail above, substantial evidence supports the ALJ's conclusion and she did not err in assigning little weight to Dr. Osorio's extremely limited – and wholly unsupported – opinion regarding Plaintiff's functioning.

*Dr. Saghafi*

Plaintiff also argues the ALJ erred by giving only some weight to Dr. Saghafi's opinion. (Doc. 12, at 14–16). Dr. Saghafi stated Plaintiff could not perform heavy exertional lifting or bend, walk, or stand for prolonged periods. (Tr. 286). The ALJ explained she gave this opinion only some weight because though the record partially supported it, it was vague. (Tr. 15). Plaintiff specifically argues Dr. Saghafi's opinion was inconsistent with light work, but Plaintiff is mistaken. (Doc. 12,

30

at 15–16). State agency consultants Dr. Neiger and Dr. Villanueva both specifically noted an RFC limiting Plaintiff to no more than four hours of walking or standing in an eight-hour workday would be consistent with Dr. Saghafi's limitations. (Tr. 348, 359).[6] Further, Dr. Saghafi only said Plaintiff could not perform "heavy exertional lifting", and an exertional restriction to light work necessarily accounted for Plaintiff's inability to do heavy work.[7] By adopting the state agency consultant opinions (Tr. 15), the ALJ accounted for Dr. Saghafi's limitations, as the consultant opinions expressly incorporated walking and light work restrictions (Tr. 13–16, 340–49, 351–59).[8] Thus, the ALJ did not err in giving Dr. Saghafi's opinion some weight, and despite Plaintiff's arguments to the contrary, the Court finds Dr. Saghafi's opinion was consistent with the light work RFC.

Reliance on VE Testimony

Essentially restating her position that the ALJ erred in analyzing Plaintiff's severe impairments and physician opinions, Plaintiff argues these errors caused the ALJ to improperly determine her RFC, and alleges the VE testimony based on that RFC was therefore insufficient to show Plaintiff could perform jobs existing in the national economy. (Doc. 12, at 15–16).

---

6. Dr. Neiger stated "[t]he RFC should limit her to 4 hr. standing/walking in a day. This would be consistent with the CE recommendation of no prolonged walking and giving the CE weight would then be appropriate." (Tr. 348). Dr. Villanueva stated "[w]ith the CE recommendation of no prolonged walking/standing in an 8 hr work day, a 4 hr limitation would be appropriate." (Tr. 359).

7. *See* 20 C.F.R. §§ 404.1567(a)–(e). "To determine the physical exertion requirements of work in the national economy, we classify jobs as sedentary, light, medium, heavy, and very heavy. . . . Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. . . . Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds." *Id.* §§ 404.1567(b), (d).

8. Dr. Villanueva's RFC assessment was somewhat inconsistent regarding whether Plaintiff could stand for two or four hours (Tr. 252–53), but this is irrelevant because the VE testified Plaintiff could perform her past work even if limited to two hours of standing. (Tr. 59).

Specifically, Plaintiff contends the ALJ improperly relied on VE testimony because the testimony "was elicited in response to an incomplete hypothetical question . . . that failed to accurately account for [Plaintiff's] limited ability to stand, walk, bend, and relate to the public." (Doc. 12, at 15–16).

As discussed above in the treating physician section, substantial evidence supports the ALJ's conclusion that Plaintiff can perform a limited range of light work. The medical evidence and other evidence showed Plaintiff can function relatively well, and the ALJ considered Plaintiff's subjective complaints of pain in the RFC determination. At the hearing, the ALJ asked the VE whether a person with the RFC she ultimately assigned to Plaintiff could perform Plaintiff's past relevant work as a production assembler, and the VE testified affirmatively. (Tr. 58–59). Moreover, the VE even testified Plaintiff could perform her past relevant work as a production assembler if she could only stand two hours in an eight-hour workday, further testifying Plaintiff could *still* perform numerous jobs if she were limited to occasional use of her non-dominant hand. (Tr. 59–60). Plaintiff also explained to the SSA that as a production assembler she never lifted more than ten pounds, could sit or stand at will, and never stood or walked more than two hours per day. (Tr. 164). She also said she left that job because the factory closed, not because of any difficulty performing the job. (Tr. 164). Because the hypothetical accurately reflected Plaintiff's limitations and the ALJ adopted those restrictions in the RFC (and keeping in mind that Plaintiff could still perform work even with additional limitations), the ALJ did not err by relying on VE testimony to find Plaintiff could perform her past relevant work. Substantial evidence thus supports the ALJ's conclusion that Plaintiff was not disabled. (Tr. 16–17).

## CONCLUSION

Following review of the arguments presented, the record, and applicable law, the Court finds the ALJ's decision supported by substantial evidence. Therefore, the Court affirms the Commissioner's decision denying benefits.

IT IS SO ORDERED.

_____s/James R. Knepp, II_____
United States Magistrate Judge
